BUCK ET AL. *v.* JEWELL-LaSALLE REALTY COMPANY.

SAME *v.* SAME.

Nos. 138 and 139.   Argued March 3, 4, 1931.—Decided April 13, 1931.

*Mr. Thomas G. Haight,* with whom *Messrs. Nathan Burkan, Louis D. Frohlich, E. S. Hartman,* and *Maurice J. O'Sullivan* were on the brief, for Buck et al.

*Mr. Charles M. Blackmar,* with whom *Mr. Kenneth E. Midgley* was on the brief, for Jewell-LaSalle Realty Company.

192

*Messrs. Louis G. Caldwell* and *Philip G. Loucks,* by special leave of Court, filed a brief on behalf of the National Association of Broadcasters, Inc., as *amicus curiae.*

194

Mr. Justice Brandeis delivered the opinion of the Court.

These suits were brought in the federal court for western Missouri by the American Society of Composers, Authors and Publishers, and one of its members, against the Jewell-LaSalle Realty Company, which operates the LaSalle Hotel at Kansas City. The hotel maintains a master radio receiving set which is wired to each of the public and private rooms. As part of the service offered to its guests, loud-speakers or head-phones are provided so that a program received on the master set can, if desired, be simultaneously heard throughout the building. Among the programs received are those transmitted by Wilson Duncan who operates a duly licensed commercial broadcasting station in the same city. Duncan selects his own programs and broadcasts them for profit. There is no arrangement of any kind between him and the hotel. Both were notified by the plaintiff society of the existence of its copyrights and were advised that unless a license were obtained, performance of any copyrighted musical composition owned by its members was forbidden. Thereafter, a copyrighted popular song, owned by the plaintiffs, was repeatedly broadcast by Duncan and was received by the hotel company and made available to its guests. Suits were brought for an injunction and damages for the alleged infringements.[1] After a hearing on stipulated facts, relief against the hotel company was denied on the ground that its acts did not constitute a "performance" within the Copyright Act. *Buck* v. *Duncan*, 32 F. (2d) 366. Plaintiffs appealed to the Circuit Court of Appeals which certified the following question:

"Do the acts of a hotel proprietor, in making available to his guests, through the instrumentality of a radio re-

[1] In No. 138, Duncan was joined as a defendant and a decree *pro confesso* for failure to answer was entered against him. In No. 139, the hotel company was the only defendant. See also No. 140, *post*, p. 202.

ceiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, the hearing of a copyrighted musical composition which has been broadcast from a radio transmitting station, constitute a performance of such composition within the meaning of 17 USC Sec. 1 (e)? "

The provision referred to is § 1 of the Copyright Act of March 4, 1909, c. 320, 35 Stat. 1075, which provides that: "Any person entitled thereto, upon complying with the provisions of this Act, shall have the exclusive right: . . . (e) To perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit."

The parties agree that the owner of a private radio receiving set who in his own home invites friends to hear a musical composition which is being broadcast, would not be liable for infringement. For even if this be deemed a performance, it is neither public nor for profit. Compare *Herbert* v. *Shanley Co.,* 242 U. S. 591. The contention that what the hotel company does is not a performance within the meaning of the Copyright Act is urged on three grounds.

*First.* The defendant contends that the Copyright Act may not reasonably be construed as applicable to one who merely receives a composition which is being broadcast. Although the art of radio broadcasting was unknown at the time the Copyright Act of 1909 was passed, and the means of transmission and reception now employed are wholly unlike any then in use,[2] it is not denied that such

---

[2] Station KDKA, erected in Pittsburgh in 1920, was the pioneer commercial broadcasting station in the world. The Radio Industry, Harvard Graduate School of Business Administration Lectures, 1927–28, pp. 195–209. The latest amendment of the Copyright Act which added new classes of copyrights was that of August 24, 1912, c. 356, 37 Stat. 488.

broadcasting may be within the scope of the Act.[8]   Compare *Kalem Co.* v. *Harper Bros.*, 222 U. S. 55; *Gambart* v. *Ball*, 14 C. B. (N. S.) 306, 319.   The argument here urged, however, is that since the transmitting of a musical composition by a commercial broadcasting station is a public performance for profit, control of the initial radio rendition exhausts the monopolies conferred—both that of making copies (including records) and that of giving public performances for profit (including mechanical performances from a record); and that a monopoly of the reception, for commercial purposes, of this same rendition is not warranted by the Act.   The analogy is invoked of the rule under which an author who permits copies of his writings to be made cannot, by virtue of his copyright, prevent or restrict the transfer of such copies.   Compare *Bobbs-Merrill* v. *Straus*, 210 U. S. 339.   This analogy is inapplicable.   It is true that control of the sale of copies is not permitted by the Act,[4] but a monopoly is expressly granted of all public performances for profit.

The defendant next urges that it did not perform, because there can be but one actual performance each time

---

[8] See *M. Witmark & Sons* v. *L. Bamberger Co.*, 291 Fed. 776; *Remick & Co.* v. *American Automobile Accessories Co.*, 5 F. (2d) 411; *Remick & Co.* v. *General Electric Co.*, 16 F. (2d) 829.   See also *Messager* v. *British Broadcasting Co., Ltd.*, [1927] 2 K. B. 543, reversed [1928] 1 K. B. 660, affirmed, [1929] A. C. 151; *Chappell & Co., Ltd.*, v. *Associated Radio Co. of Australia, Ltd.*, [1925] Vict. L. R. 350.

[4] The rule of the *Bobbs-Merrill* case was enacted into the Copyright Act of March 4, 1909, c. 320, § 41, 35 Stat. 1075, 1084.   See H. Rep. No. 2222, 60th Cong., 2d Sess., February 22, 1909, p. 19. It is applicable only where there is no relation between the manufacturer of the copy and the purchaser which might make the latter liable as a contributory infringer.   Compare *Scribner* v. *Straus*, 210 U. S. 352, 355.   In the case at bar, the stipulated facts show that there was no relation whatever between the broadcaster and the hotel company so that even if the broadcasting constituted an infringement, there would be no question of contributory infringement.

a copyrighted selection is rendered; and that if the broadcaster is held to be a performer, one who, without connivance, receives and distributes the transmitted selection cannot also be held to have performed it. But nothing in the Act circumscribes the meaning to be attributed to the term " performance," or prevents a single rendition of a copyrighted selection from resulting in more than one public performance for profit. While this may not have been possible before the development of radio broadcasting, the novelty of the means used does not lessen the duty of the courts to give full protection to the monopoly of public performance for profit which Congress has secured to the composer. Compare *Kalem Company* v. *Harper Bros.*, 222 U. S. 55, 63. No reason is suggested why there may not be more than one liability. And since the public reception for profit in itself constitutes an infringement, we have no occasion to determine under what circumstances a broadcaster will be held to be a performer, or the effect upon others of his paying a license fee.

The defendant contends further that the acts of the hotel company were not a performance because no detailed choice of selections was given to it. In support of this contention it is pointed out that the operator of a radio receiving set cannot render at will a performance of any composition but must accept whatever program is transmitted during the broadcasting period. Intention to infringe is not essential under the Act. Compare *Hein* v. *Harris*, 175 Fed. 875, affirmed, 183 Fed. 107; *Stern* v. *Remick & Co.*, 175 Fed. 282; *Haas* v. *Leo Feist, Inc.*, 234 Fed. 105; *M. Witmark & Sons* v. *Calloway*, 22 F. (2d) 412, 414. And knowledge of the particular selection to be played or received is immaterial. One who hires an orchestra for a public performance for profit is not relieved from a charge of infringement merely because he does not select the particular program to be played. Similarly, when he tunes in on a broadcasting station, for his own commercial purposes, he necessarily assumes the

risk that in so doing he may infringe the performing rights of another. Compare *Harms* v. *Cohen,* 279 Fed. 276, 278; *M. Witmark & Sons* v. *Pastime Amusement Co.,* 298 Fed. 470, 475, affirmed, 2 F. (2d) 1020; *M. Witmark & Sons* v. *Calloway,* 22 F. (2d) 412, 413. It may be that proper control over broadcasting programs would automatically secure to the copyright owner sufficient protection from unauthorized public performances by use of a radio receiving set,[5] and that this might justify legislation denying relief against those who in using the receiving set innocently invade the copyright,[6] but the existing statute makes no such exception.

*Second.* The defendant contends that there was no performance because the reception of a radio broadcast is no different from listening to a distant rendition of the same program.[7] We are satisfied that the reception of a

[5] If the copyrighted composition had been broadcast by Duncan with plaintiffs' consent, a license for its commercial reception and distribution by the hotel company might possibly have been implied. Compare *Buck* v. *Debaum,* 40 F. (2d) 734. But Duncan was not licensed; and the position of the hotel company is not unlike that of one who publicly performs for profit by the use of an unlicensed phonograph record.

[6] See the so-called Vestal Copyright bill, which failed of passage in the Seventy-first Congress. H. R. 12549, 71st Cong., 2d Sess., § 15 (d). Compare Note 10, *infra.* See also arguments concerning the broadcasting of copyrighted selections as set forth in Joint Hearings before the Committees on Patents, on S. 2328 and H. R. 10353, 69th Cong., 1st Sess., April 5–9, 1926; Hearings before the Senate Committee on Patents, on H. R. 12549, 71st Cong., 3d Sess., January 28–29, 1931, pp. 52, *et seq.;* Sen. Rep. No. 1732, *id.,* February 17, 1931, p. 29.

[7] This argument is based upon an elaborate discussion of the theory of radio transmission and reception. Defendant's hypothesis is that the energy which actuates the receiving apparatus—that is, which varies the currents in the receiver to produce audible sound—is part of the original energy exerted upon the air by the performer. Hence it is urged that the radio receiving set is no more than a mechanical or electrical ear-trumpet for the better audition of a distant performance.

radio broadcast and its translation into audible sound is not a mere audition of the original program. It is essentially a reproduction. As to the general theory of radio transmission there is no disagreement. All sounds consist of waves of relatively low frequencies which ordinarily pass through the air and are locally audible. Thus music played at a distant broadcasting studio is not directly heard at the receiving set. In the microphone of the radio transmitter the sound waves are used to modulate electrical currents of relatively high frequencies which are broadcast through an entirely different medium, conventionally known as the " ether." These radio waves are not audible.[8] In the receiving set they are rectified; that is, converted into direct currents which actuate the loudspeaker to produce again in the air sound waves of audible frequencies. The modulation of the radio waves in the transmitting apparatus, by the audible sound waves is comparable to the manner in which the wax phonograph record is impressed by these same waves through the medium of a recording stylus.[9] The transmitted radio waves require a receiving set for their detection and trans-

---

[8] Sound waves, which can pass through air, water, or solids, and radio or other electromagnetic waves, which operate in the " ether," behave similarly in many respects. Yet not only are the latter inaudible but they travel at relatively tremendous speeds. Sound waves travel, at ordinary temperatures, approximately 1100 feet a second, electromagnetic waves with the speed of light, or about 186,000 miles per second. This velocity is dependent solely upon the particular medium through which the various kinds of waves travel. See Morecroft, Principles of Radio Communication, c. IV. Thus, broadcast time-signals can be heard practically simultaneously on receiving sets hundreds of miles apart; ordinary sound signals cannot. Compare as to the general theory of radio communication, *Radio Corp. of America* v. *Twentieth Century Radio Corp.*, 19 F. (2d) 290, 291; *Chappell & Co., Ltd.*, v. *Associated Radio Co.* (1925), 50 Victoria Law Reports 350, 357–8.

[9] The impressions on the phonograph disc are of course permanent, whereas the modulations of the carrier radio ·waves, continually emitted by the sending station, are ephemeral. But in both cases the

lation into audible sound waves, just as the record requires another mechanism for the reproduction of the recorded composition. In neither case is the original program heard; and, in the former, complicated electrical instrumentalities are necessary for its adequate reception and distribution. Reproduction in both cases amounts to a performance. Compare *Buck* v. *Heretis,* 24 F. (2d) 876; *Irving Berlin, Inc.,* v. *Daigle,* 31 F. (2d) 832, 833. In addition, the ordinary receiving set, and the distributing apparatus here employed by the hotel company, are equipped to amplify the broadcast program after it has been received. Such acts clearly are more than the use of mere mechanical acoustic devices for the better hearing of the original program. The guests of the hotel hear a reproduction brought about by the acts of the hotel in (1) installing, (2) supplying electric current to, and (3) operating the radio receiving set and loud-speakers. There is no difference in substance between the case where a hotel engages an orchestra to furnish the music and that where, by means of the radio set and loud-speakers here employed, it furnishes the same music for the same purpose. In each the music is produced by instrumentalities under its control.[10]

---

means used to transmit the selection being played are wholly different from the musical sounds themselves, and require an additional mechanism, not under the control of the performer, for the re-creation of the original music.

[10] At the present time there are renewed proposals for the revision of the Copyright Act in the light of new conditions. See summaries in the Annual Report of the Register of Copyrights (1928), pp. 6–13; *id.* (1929), pp. 16–24; *id.* (1930), pp. 8–13. See also the so-called Vestal Bill, the most recent of these, introduced in the Seventy-first Congress on May 22, 1930. H. R. 12549, 71st Cong., 2d Sess., § 1 (d), (g); Sen. Rep. No. 1732, *id.,* 3d Sess., Feb. 17, 1931, pp. 4–5, 29. Compare Hearings before the Senate Committee on Patents on H. R. 12549, *id.,* January 28–29, 1931, pp. 25, *passim.* This measure was debated at length in the Senate, but was not reached on the final calendar. See 74 Cong. Rec., Pt. IV, pp. 6213–6849; *id.,* Pt. V, p. 33.

*Third.* The defendant contends that there was no performance within the meaning of the Act because it is not shown that the hotel operated the receiving set and loudspeakers for profit. Unless such acts were carried on for profit, there can, of course, be no liability. But whether there was a performance does not depend upon the existence of the profit motive. The question submitted does not call for a determination whether the acts of the hotel company recited in the certificate constitute operation for profit.

*The question certified is answered: Yes.*