**FAMOUS MUSIC CORPORATION et al. v. MELZ.**

No. 548.

District Court, W. D. Louisiana, Monroe Division.

Aug. 9, 1939.

768 .

J. Studebaker Lucas, of New Orleans, La., for plaintiffs.

G. P. Bullis, of Ferriday, La., for defendant.

PORTERIE, District Judge.

The defendant herein has operated a moving picture show in the town of Ferriday (population 2,500), parish of Concordia, state of Louisiana, for a number of years. As early as the year 1932, traveling agents of the American Society of Composers, Authors and Publishers (to be referred to herein as the Society) called on the defendant and, as educational propaganda, explained to him their views and interpretation of the Copyright Act of March 4, 1909, c. 320, §§ 1, 64, 35 Stat. 1075, 1088, 17 U.S.C.A. § 1.

These agents explained the legal origin and existence of the said Society; that it was the exclusive owner of the right of public performance for profit of the musical compositions forming a part of films produced at his theater; that the defendant bought from the film producer the words and music of these musical compositions only in the form of sound on film, commonly known as moving picture reels; that when the Arcade Theater opened its doors, charged for admission, and the moving pictures, with synchronized music, were produced, the defendant became liable to the Society for a license for the public performance; that a license for such public performance could be had from the Society at the annual price of ten cents per seat.

The Arcade Theater continued in its use of motion picture films including numerous musical compositions, equitable title to the public performance rights of which is claimed by the Society. On the second day of October, 1932, the theater was visited by two agents of the Society. On trial they testified that three musical compositions, to wit, "Deep Night", forming a part of a film entitled "Rudy Vallee Melodies", "Just One More Chance" and "I'd Climb the Highest Mountain (If I Knew I'd Find You)" forming parts of a film entitled "Magic Washing Machine", were publicly produced.

This suit was filed on July 20, 1933, embodying in the main the above narrative.

Plaintiffs pray for a permanent injunction and conclude with the prayer for imposition of the minimum damage of $250 in each case.

Defendant prayed for more particulars; and, consequently, in two · supplemental amendments to the petition the plaintiffs further alleged "that the three musical compositions were not incorporated in the aforesaid film productions with the knowledge, consent or license of the owner of the copyright of said musical compositions for exhibition or performance in the defendant's theater."

The defense was first made by a plea of estoppel, substantially alleging that the musical compositions on which plaintiffs claimed copyright were embodied in and made a part of motion picture films; that defendant purchased from the owners of the copyright of said completed films the right to produce said films; that defendant was in ignorance of what musical compositions formed a part of these films until he produced them at the public performance; that the musical compositions were not subject to be dissociated from the picture itself, either physically, artistically or commercially; that when said films were made they were copyrighted as a whole by the producers and that defendant bought from said copyright holder the right to produce said films; that for the plaintiffs to permit said manufacturers to embody in their films said songs and then to claim that the manufacturer had no right to license their production was contrary to fairness and customary business usage; consequently, that plaintiffs were estopped.

Upon the plea of estoppel and motion to dismiss being argued, it was ruled by agreement that "defendant may submit interrogatories as to extent of license, if any, to producers of films in which musical compositions alleged to have been infringed on were used, reserving to both sides any exception as to scope and relevancy of such interrogatories or their answers, thus to save expense and delay; interrogatories to be submitted within 30 days and answers of defendant 30 days thereafter."

These interrogatories were never issued by defendant. This is to be construed against him, especially when connected later with the proof by plaintiffs that the maker of the film had no right to grant authority to anyone to use these films, free of additional royalty, for public performance for profit. The interrogatories, if issued and

answered, would have developed, we feel sure, the fact that the makers of the films had paid the royalty due to the copyright owner for the "use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work." See Sec. 1, par. e, of the Act, 17 U.S.C.A. § 1.

The necessity for the payment of additional royalty is made clear by a further quotation from the Act, same section and paragraph: "The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright *except in case of public performance for profit."* (Italics supplied)

The answer of the defendant, after reservation of the benefit of the plea of estoppel and the motion to dismiss, was a general denial of all of the allegations of the plaintiffs.

Upon trial, plaintiffs, in addition to proving by their two agents the infringement as stated in the narrative above, brought out a very frank and full exposition of the legal status of the Society. This was done for each one of the three joint plaintiffs; each one of them showing that the equitable title to the public performance rights of each one of the three musical compositions vested by contract with the Society, and, particularly, that each one of the plaintiffs had never extended in any manner to either the Educational Pictures Corporation or the Paramount Film Company, or anyone having control over the production or exhibition of said motion picture films, the right to perform said musical compositions as a part of the exhibition of said motion pictures in the theater owned by the defendant, situated in the town of Ferriday, Louisiana, or any other theater, whether owned or controlled by either one of those film producing companies or not.

It was shown by plaintiffs that the Society, the proved owner of the right to license for the public performance of these three musical compositions, never did grant to either of the film companies, producers of the motion picture films, control over the production or exhibition of said musical compositions, nor were they or anyone else authorized to license the said musical compositions as a part of the exhibition of said motion picture films.

The defendant had no defense except as is indicated by its plea of estoppel and general denial.

It is the opinion of the Court that the motion picture films were copyrighted insofar as they were instruments capable of reproducing mechanically these three musical compositions. The film producers, as the evidence discloses, had no right, direct or implied, to grant the license as to public performance. That is, when the defendant bought these three moving picture films, he had no further right insofar as a public performance for profit was concerned, either from the film producing company or the Society.

The point is covered in the case of Irving Berlin, Inc., v. Daigle, 5 Cir., 31 F.2d 832, at page 834, wherein the following language appears: "By the terms of the provision, section 1(e), conferring on the proprietor of a copyrighted musical work the exclusive right of reproducing it mechanically, one who acquires that right by contract with the proprietor, or by complying with the prescribed requirements as to paying royalties, does not by such acts acquire the right of publicly performing for profit the copyrighted work."

The defendant is responsible for the royalty due the copyright owner when it opens its doors, invites the public, collects admission fees, and reproduces audibly to the audience.

These acts by the defendant differentiate this case substantially from the case of Buck v. Debaum, D.C., 40 F.2d 734. The main difference is that in the Debaum case no definite and elaborately detailed act by the proprietor of the cafe was necessary to cause the radio to gather and reproduce to the patrons the programs of any broadcasting station within range of reception. In the instant case the defendant buys a moving picture film containing as a part thereof the copyrighted song. This film is legally permitted, authorized and licensed to exist in its condition physically, but no further license exists for its public use for profit. The defendant took definite and deliberate action, bringing about public performance for profit, for which right he has not paid any royalty to the copyright owner.

The points of agreement between the instant case and the case of Irving Berlin, Inc., v. Daigle (Same v. Russo et al.), 31 F.2d 832, cited above, are evident. In the instant case, we have the film on a reel, to be used on a projecting machine; in the Irving Berlin case, we have wax records, for use on a phonograph. In both the performance is for profit. In the instant case, the

770

phase of public performance is the more accentuated and the fact of public performance for profit is the more evident and direct.

In Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266, the idea of protection of the copyright owner goes much further than in the instant case. In that case the hotel furnished, as part of the service offered to its guests, a radio program received on a master set within the hotel; the master set receiving musical compositions transmitted over a local broadcasting station in the same city. The master set reproduced the songs to the private rooms of the guests, and to the common gathering places, such as the lobby, dining room, etc. It is true that the local broadcasting station had not paid any copyright license for broadcasting; but the Supreme Court in the above case said, 283 U.S. 191, 51 S.Ct. at page 412, 75 L.Ed. 971, 76 A.L.R. 1266: "And knowledge of the particular selection to be played or received is immaterial. One who hires an orchestra for a public performance for profit is not relieved from a charge of infringement merely because he does not select the particular program to be played. Similarly, when he tunes in on a broadcasting station, for his own commercial purposes, he necessarily assumes the risk that in so doing he may infringe the performing rights of another. Compare Harms v. Cohen, D.C., 279 F. 276, 278; M. Witmark & Sons v. Pastime Amusement Co., D.C., 298 F. 470, 475, affirmed 4 Cir., 2 F.2d 1020; M. Witmark & Sons v. Calloway, D.C., 22 F.2d 412, 413. It may be that proper control over broadcasting programs would automatically secure to the copyright owner sufficient protection from unauthorized public performances by use of a radio receiving set, and that this might justify legislation denying relief against those who in using the receiving set innocently invade the copyright; but the existing statute makes no such exception."

■ Finally, the trench of resistance to which the defendant retreats is the allegation of the want of notice in this case, as supposedly provided by Section 9 of the Copyright Act, 17 U.S.C.A. § 9. This section reads as follows: "Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the

United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 21 of this title."

In the joint case of Irving Berlin, Inc., v. Daigle and Russo, previously cited, where the medium physically involved was a phonograph record, Judge Foster, in a concurring opinion, said: "There is no provision in the act for the affixing of a notice of copyright to a phonograph record or other mechanical contrivance, and we may take notice from the universal use of phonographs that such notice is not affixed."

By analogy we are of the same opinion here; there was no notice necessary or that could be put on the film with sound, the moving picture reel. No notice of copyright could be imprinted, because there was no license from the copyright owner to the manufacturer of the reel or, if you wish, to the producer of the film, authorizing use of the reel for public performance. All of the contracts filed in the case support this contention.

Therefore the Court is without else to do than grant the prayer of plaintiffs' petition in full, allowing the minimum penalty of $250 in each case and granting a permaent injunction restraining the plaintiff. Judgment will be signed accordingly.