**REMICK MUSIC CORPORATION v. INTERSTATE HOTEL CO. OF NEBRASKA and ten other cases.**

Nos. 321, 322, 325, 327–329, 331, 332, 334, 443, 509.

District Court, D. Nebraska, Omaha Division.

Dec. 9, 1944.

See, also, 2 F.R.D. 510.

James J. Fitzgerald Jr., and Seymour L. Smith, both of Omaha, Neb., Joseph D. Karp, of New York City, and Ellick, Fitzgerald & Smith, of Omaha, Neb., for plaintiffs Remick Music Corporation and others.

Yale C. Holland, Eugene N. Blazer, and Kennedy, Holland, DeLacy & Svoboda, all of Omaha, Neb., for plaintiff Shapiro, Bernstein & Co.

William J. Hotz, William F. Dalton, and Hotz & Hotz, all of Omaha, Neb., for defendants Interstate Hotel Co. of Nebraska.

William J. Hotz, Henry Monsky, William Grodinsky, and Monsky, Grodinsky, Marer & Cohen, all of Omaha, Neb., for defendant Regis Hotel Co.

John H. Comstock, of Lincoln, Neb., and William J. Hotz, of Omaha, Neb., for defendant Ada Kobalter.

DELEHANT, District Judge.

In the ruling now announced, disposition is made of the eleven cases noted in the caption, which, though entirely distinct, each from all of the others, have been submitted to the court in a single trial and oral argument, and largely upon single briefing operations. That course has been practicable because the legal issues involved are essentially identical in all the cases, and their facts are generally similar in their pattern.

In each single count case, and in each cause of action in the several multiple count cases, the sole proprietor of a copyrighted musical composition and of the copyright thereof, and the alleged sole owner of the right of public performance for profit of the composition, seeks injunctive relief and an award of damages with costs, including an attorneys fee, against the defendant upon the asserted ground of the defendant's infringement of the copyright through public performance for profit of the musical composition at a public place of business, entertainment or amusement operated by the defendant. Although the singular number has just been, and throughout this opinion will be, employed in referring to the plaintiff in each case, it may be noted, without repetition, that in case 334, two parties join in the quest for relief. For convenience the claimant in each case is referred to here as "plaintiff", although in each of the first nine cases the designation chosen by the pleading claimant is "complainant".

The defense presented to each claim is such that it has seemed orderly and logical for the court to divide the analysis of the cases, both in their facts and in their legal consideration, into two phases. Each claim is resisted, first, upon the ground that, wholly apart from any domestic law of Nebraska, the claim is not maintainable; and secondly, upon the ground that recovery may not be allowed because of certain Nebraska legislation. In the interest, therefore, of the facile approximation of related facts and legal principles, consideration will be given to the claims, first in their general aspect, unaffected by the impact of Nebraska's statutes; and, thereafter and specifically, in the light of the Nebraska legislation which the defendants severally put forth as a bar to recovery against them or any of them.

In each single count complaint, and in each cause of action in each multiple count complaint, the following allegations are made and are admitted in the applicable answer: (a) The foundation of the claim upon the copyright laws of the United States; (b) the incorporation, and existence at all times relevant, under the laws of New York, of the plaintiff (with due allowance for the individuality of one of the two plaintiffs in case No. 334), and its participation in the business of printing, publishing and vending copyrighted musical compositions; (c) in the case of each defendant except the individual defendants, its incorporation under the laws of Nebraska and its engagement in the regular transaction of business in Nebraska; (d) that, on the date of the alleged infringement, which, in each case except those numbered 443 and 509, was within a period of six days in the middle of March, 1942, in case No. 443, was on March 31, 1943, and in the several counts of case No. 509 included April 10, 1943, and April 14, 1943, the defendant was engaged in, and operated and controlled a designated business, the nature of which will be mentioned briefly hereafter, in the city of Omaha, Nebraska, in all instances except case No. 509, and in that case near the city of Lincoln, Nebraska; (e) that (except in cases numbered 443 and 509 in which adequate proof is made upon the point and admission is also made upon the trial) the words and music of the allegedly infringed musical composition were written and composed respectively by designated persons or by a single person, prior to a designated date; (f) that after the writing and composition of the musical piece involved, it was wholly and without reservation assigned by its author and composer, in some cases directly, in others through mesne transfers, to the plaintiff which on such acquisition became, and at all material dates remained, the sole owner of the composition; (g) that, on a date identified in the complaint, and in each in-

stance before the alleged infringement, the then specified owner of the musical composition and successor in that title to its author and composer duly copyrighted the composition by publishing it and offering it for sale to the general public bearing a quoted notice of copyright on the front page of its published sheets; and promptly thereupon deposited in the office of the Register of Copyrights two complete copies of the best edition of the composition then published, accompanied by a claim of copyright, and paid the legal fee for registration, and the composition was duly registered by the Register of Copyrights who issued to the then owner a certificate of copyright registration of which a copy is annexed to and incorporated into the complaint as an exhibit; (h) that upon each copy of the composition published and offered for sale by authority of the copyright proprietor, there was inscribed on the first page of the published sheets the copyright notice required by law setting forth the word "copyright" accompanied by the name of the copyright proprietor and the year in which the copyright was secured; that a copy of the composition involved is annexed to and incorporated into the complaint as an exhibit, and (i) that upon the first page of each copy of each composition involved is the following clearly printed legend: "All Rights Reserved Including Public Performance for Profit."

In noting the admitted facts—as well as in later observations upon negatived allegations—the court considers it unnecessary, for the purpose of a general memorandum, to set out the precise sequence of dates in the process of publication and copyright, or of the assignments culminating in the final transfers to the plaintiffs; or to identify by name all of the compositions, their authors and composers and the channels through which the alleged and admitted assignments were made. All of such matters will be covered in exact detail in the findings of fact whose preparation is hereinafter directed. And for convenience a brief summary of the names of the several compositions involved, the authors of their lyrics and composers of their music, their dates of copyright, and the time, place, and method of infringing production by the respective defendants is set out in a footnote.[1]

---

[1] SUMMARY BY CASES OF DETAILS AS TO MUSICAL COMPOSITIONS, COMPOSERS, DATES OF COPYRIGHTS, MANNER AND DATE OF PERFORMANCE, AND CHARACTER OF PLACE WHERE PERFORMANCE OCCURRED

CASE NUMBER

SUMMARY

321　"BLUES IN THE NIGHT", lyric by JOHNNY MERCER, music by HAROLD ARLEN, copyright September 18, 1941, performed by strolling string bass and accordion players from Arthur Randall's orchestra, and also by the whole orchestra, at about 9:30 o'clock on evening of March 14, 1942, in the "Black Mirror Room", a public dancing, dining and refreshment room in Hotel Fontenelle.

322　" 'TIS AUTUMN," lyric and music both by HENRY NEMO, copyright September 30, 1941, performed by an organist, Warren Pfeiffer, on an electric organ at about 10:55 o'clock on evening of March 14, 1942, in the "White Horse Inn", a public room for the sale of refreshments in the Regis Hotel.

325　" 'TIS AUTUMN", (supra) performed by "Deb" Lyon and his small orchestra at about 11:50 o'clock on the evening of March 16, 1942, in the "Cave Under The Hill", a "small night club" or refreshment room in the Hill Hotel.

327　"MY BUDDY", lyric by GUS KAHN, music by WALTER DONALDSON,
Count I　copyright September 6, 1922, performed by Paul Moorhead and his orchestra at about 2:15 o'clock on the afternoon of March 14, 1942 in "The Pax Room", the main dining room of The Paxton Hotel.

Count II　"BLUES IN THE NIGHT" (supra), performed by Paul Moorhead and his orchestra at about 1:40 o'clock in the afternoon of March 14, 1942 in "The Pax Room" the main dining room of The Paxton Hotel.

328　"IN A SHANTY IN OLD SHANTY TOWN", lyric by JOE YOUNG, music
Count I　by LITTLE JACK LITTLE and JOHN SIRAS, copyright March 29, 1932, performed by Lee Williams and his orchestra, at about 11:05 o'clock on the night of March 15, 1942, in "Peony Park" a large public ballroom.

Certain important allegations of the several complaints are denied. And they will now be considered, and the factual findings of the court upon them will be announced, and, in certain instances, the legal considerations involved in such findings will be set down briefly.

In connection with every alleged cause of action, the defendant therein expressly denies that the musical composition in-

| | |
|---|---|
| Count II | "'TIS AUTUMN" (supra), performed by Lee Williams and his orchestra, at about 12:40 o'clock on the morning of March 16, 1942, in "Peony Park" a large public ballroom. |
| 329 | "BLUES IN THE NIGHT" (supra) performed by a colored orchestra at about 10:50 o'clock on the evening of March 19, 1942 in "The Bombshell" a "fairly large night club" and dance hall publicly operated in South Omaha. |
| 331 | "THE LAST TIME I SAW PARIS", lyric by OSCAR HAMMERSTEIN II, music by JEROME KERN, copyright September 16, 1940, performed by Rod Jones, organist on electrical organ at about 9:18 o'clock on the evening of March 18, 1942, in The Crosstown Roller Rink, a public roller skating rink. |
| 332 | "DAY DREAMING", lyric by GUS KAHN, music by JEROME KERN, copyright September 29, 1941, performed by Paul Moorhead and his orchestra at about 1:50 o'clock in the afternoon of March 14, 1942, in "The Pax Room" the main dining room of The Paxton Hotel. |
| 334 Count I | "SMOKE GETS IN YOUR EYES", lyric by OTTO HARBACH, music by JEROME KERN, copyright November 3, 1933, performed by an organist not positively identified, but associated with Arthur Randall's orchestra, at about 8:55 o'clock in the evening of March 14, 1942, in "The Black Mirror Room", a public dancing, dining and refreshment room in Hotel Fontenelle. |
| Count II | "MAKE BELIEVE", lyric by OSCAR HAMMERSTEIN II, music by JEROME KERN, copyright November 30, 1927, performed by an organist not positively identified but associated with Arthur Randall's orchestra, at about 9 o'clock on the evening of March 14, 1942, in "The Black Mirror Room", a public dancing, dining and refreshment room in Hotel Fontenelle. |
| 443 Count I | "SWEET SUE, JUST YOU", lyric by WILL J. HARRIS, music by VICTOR YOUNG, copyright April 10, 1928, performed by Paul E. Brown, a blind organist, on a Hammond electric organ between 11:30 and 12 o'clock on the evening of March 31, 1942, in "The Cottonwood Room" a public dining and refreshment room in "The Blackstone Hotel. |
| Count II | "S-H-I-N-E", lyric by CECIL MACK and LEW BROWN, music by FORD DABNEY, copyright May 7, 1924, performed in the same manner, by the same person, and at the same place and within the same general range of time as in Count I. |
| Count III | "EXACTLY LIKE YOU", lyric by DOROTHY FIELDS, music by JIMMY McHUGH, copyright February 3, 1930, performed in the same manner, by the same person, and at the same place and within the same general range of time as in Count I. |
| Count IV | "SWEET ELOISE", lyric by MACK DAVID, music by RUSS MORGAN, copyright May 22, 1942, performed in the same manner, by the same person and at the same place and within the same general range of time as in Count I. |
| 509 Count I | "EXACTLY LIKE YOU" (supra) performed by Dave Haun and his orchestra both at about 10:15 o'clock and at about 11:35 o'clock on the evening of April 10, 1943, at the Pla-Mor Party House, a public dance hall at which admission was charged for attendance. |
| Count II | "SWEET SUE, JUST YOU" (supra) performed in the same manner by the same persons and at the same place as in Count I, but at about 11:30 o'clock on the evening of April 10, 1942. |
| Count III | "PENNSYLVANIA POLKA", lyric by LESTER LEE, music by ZEKE MANNERS, copyright May 22, 1942, performed by Eddie Sheffert and his orchestra at an unidentified hour during the evening of April 14, 1943, at the same place as in Count I. |

volved was "new and original music", and thus puts in issue the factor of its novelty and originality. Upon the trial, each plaintiff introduced in evidence the certificate or certificates of copyright registration in respect of the composition or compositions upon which its complaint was founded. In some instances no further evidence was introduced by the plaintiff upon the question of novelty and originality; in others evidence was tendered and received touching the circumstances of the composition either of the lyrics or of the music or of both lyrics and music. It would needlessly prolong this memorandum to analyze that evidence in detail, at this point. Nor, in the view of the law which the court adopts, is it necessary. However, in a footnote[2] a summary analysis has been made of the cases in which at least some oral proof was offered by the plaintiffs leading to an inference of novelty and originality, either in the lyrics or in the music, or in both, of the compositions with which the cases are respectively concerned. Upon the issue tendered, no evidence at all was offered by the defendants except in case No. 331 (vide infra).

 The court must decide, therefore, in each instance, whether the plaintiff has sustained the burden of establishing the originality of the composition or compositions on which its complaint rests. It is considered that the question is to be answered affirmatively in every case. At this point the court observes the contention of the defendants that because they have specifically denied the element of originality their answers impose a special burden of proof of that issue upon the several plaintiffs. Since originality is not admitted in any case, but is denied in all of them, it may simply be recognized that each plaintiff is under the burden of establishing it. But, that granted, each plaintiff is entitled to the benefit of any presumptions which the law affords in the making of a prima facie case. And such presumptions are effective quite as readily and with like effect under the practice governed by the

---

[2] SUMMARY RESPECTING INTRODUCTION BY PLAINTIFFS OF PROOF IN ADDITION TO CERTIFICATE OF COPYRIGHT REGISTRATION, INCLUDING IDENTIFICATION OF EACH CASE BY NUMBER, AND CAUSE OF ACTION IF MORE THAN ONE, AND INDICATION EITHER OF LYRIC OR OF MUSIC OR OF BOTH COVERED BY SOME PROOF:

321, Neither; 322, both; 325, both;
327,
Count I, Neither;
Count II, Neither;
328,
Count I, Both; (though only composer of music testified, he narrated the circumstances of the collaboration with sufficient detail that originality of lyric is reasonably inferable);
Count II, Both;
329, Neither;
331, Both; (though only composer of music testified, the details incident to the communication to him of the lyric and its peculiar timeliness indicate originality);
332, Music;
334,
Count I, Music;
Count II, Music;
443,
Count I, Lyric;
Count II, Both; (though only writer of lyric testified, he showed some participation by himself in composition of music and its entire originality);
Count III, Both; (However only the composer of music affirmed the originality of the entire product. But, that, coupled with its composition for a complete musical show, lends some support to the originality of the production in its entirety);
Count IV, Lyric;
509,
Count I, Both; (but with identical reservation as in 443, Count III);
Count II, Lyric;
Count III, Both;

Federal Rules of Civil Procedure, as they were prior to the adoption of the rules. Those rules were not designed either as a complete code of evidence or for the purpose of altering—especially restrictively—the rules of evidence theretofore recognized. Rule 43(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Case No. 331 is reserved temporarily for special consideration. As to the counts contained in all of the other cases, the court is persuaded that under the statute in its present form, Title 17 U.S.C.A. § 55, the introduction of the several certificates of copyright registration raises in support of the compositions severally affected a presumption of the authorship of lyrics and music indicated therein, and of their originality and of the validity of the copyright in question. The modern authorities seem clearly to support that conclusion. Berlin v. Evans, D.C.Pa., 300 F. 677, 679; M. Witmark & Sons v. Calloway, D.C.Tenn., 22 F.2d 412, 413; Bobrecker v. Denebeim, D.C.Mo., 25 F.Supp. 208, 209, 210; Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159; Vitaphone Corporation v. Hutchinson Amusement Co., D.C.Mass., 28 F.Supp. 526, 529; Nutt v. National Institute, 2 Cir., 31 F.2d 236, affirming 28 F.2d 132; Freudenthal v. Hebrew Publishing Co., D.C., 44 F. Supp. 754 (in which, however, in consequence of the introduction of some additional proof of originality, the discussion of the probative effect of the certificate may properly be regarded as unnecessary to the decision). See also, though antedating the present statute above cited, Reed v. Carusi, C.C.Md.Fed.Cas.No.11,642, 20 Fed.Cas. p. 431; Henderson v. Tompkins, C.C.Mass., 60 F. 758.

The allowance to the certificate of copyright registration of prima facie probative significance of originality in the copyrighted composition is an altogether reasonable application of the statute which expressly directs, inter alia, that the certificate shall "contain * * * the name of the author (when the records of the copyright office shall show the same)"; and shall "be admitted in any court as prima facie evidence of the facts stated therein", Title 17 U.S.C.A. § 55. Besides, in all of these cases, except No. 331, which will shortly have individual consideration, and Nos. 443 and 509, where authorship of both lyrics and music was established by oral testimony in addition to the certificates, as well as formally admitted on the trial, the defendants in their answers, though denying originality, explicitly admit the composition of the music and the writing of the lyrics by the persons to whom such creation is attributed in the complaints.

Now, authorship presumptively connotes originality. Thus the term "author" is defined as "the beginner * * * or first mover of anything; hence, efficient cause of a thing; creator; originator; * * * a composer, as distinguished from an editor, translator or compiler." In music, "to compose" is defined as "to construct by mental labor; to design and execute, or put together, in a manner involving the adaptation of forms of expression to ideas, or to the laws of harmony or proportion." And in the literary field, which comprehends—though with an occasional cynical doubt—such items as the lyrics for popular songs, "to write" signifies, "to frame or combine ideas, and express them in written words; to compose, as an author." Webster's New International Dictionary (1925). See also Stowe v. Thomas, Fed.Cas.No.13,514, 23 Fed.Cas. 201, 206; Keene v. Wheatley, Fed.Cas.No. 7,644, 14 Fed.Cas. 180, 192; Leidersdorf v. Flint, Fed.Cas.No.8,219, 15 Fed.Cas. 260, 261.

The authorship of the works in controversy (reserving, ut supra, case 331) being both conceded in the answers or upon actual trial (in such typical admissions as, e.g., in case 321, "that Johnny Mercer and Harold Arlen composed the music and wrote the lyrics (sic.) for the said musical composition") and established by the certificates, and the defendants having elected in every case except No. 331, to introduce no evidence even remotely questioning originality, the court considers that under the authorities already cited, a prima facie case of originality and valid copyright is made out. That conclusion is supported by modern textual authority. 18 C.J.S. 265, Copyright, § 154; Shafter on Musical Copyright, 2d Ed., 1939, pp. 238, 239; Ball on Law of Copyright and Literary Property (1944) pp. 608, 609.

Upon the trial of case No. 331, involving the composition, "The Last Time I Saw Paris", the originality of the lyric (whose production by Mr. Oscar Hammerstein II was admitted) was not questioned by any evidence on the part of the defendant. But the defendant did introduce in evi-

·dence, in support of his denial of the originality of the music in the composition, a certificate of copyright registration in favor of C. Arthur Fifer, showing the deposit by him in the copyright office of the United States on April 22, 1940, of one copy of a musical composition, not reproduced in copies for sale, entitled "Lola", whose "words and melody" were said in the certificate to be by C. Arthur Fifer, and also a further certificate under date of February 4, 1941, covering the deposit of two copies of an orchestral arrangement of "Lola", a fox trot by C. Arthur Fifer, made by Ken Macomber, the arrangement being said in the certificate to have been published January 23, 1941, and finally a certificate showing the copyright registration by Broadcast Music, Inc., of "Lola", lyric and music by C. Arthur Fifer as a published work, with May 12, 1941, as the date of publication and May 26, 1941, as the date of deposit of the required two copies. But the showing of the composition "Lola" itself is almost wholly omitted. No copy of the words or music or both, either of the original unpublished work allegedly reg-. istered on April 22, 1940, or of the finally registered published work represented in the last certificate dated May 26, 1941, was produced at the trial. And, even of the Macomber orchestral arrangement, no complete copy, but only a single sheet of four pages, evidently for a piano as one orchestral instrument, and shown by the defendant's witness probably to include, though in specially arranged form, the chorus only of "Lola", was introduced in evidence. It manifestly was not in existence until after May 26, 1941, for it bears on the bottom of its first page this legend, "Copyright 1940 by C. Arthur Fifer, copyright assigned 1940 to Broadcast Music, Inc. Copyright 1941 by Broadcast Music, Inc." From that exhibit tendered as representative of "Lola" a pianist, produced as a musical expert witness for the defendant in case No. 331, performed ·comparatively on the piano in open court, for the judge's observation and instruction both an alleged chorus of "Lola", and the chorus, and later upon demand of the plaintiff's attorneys the whole of "The Last Time I Saw Paris".

For the plaintiff in case No. 331, Mr. Jerome Kern, the composer, admittedly a distinguished and competent member of his craft, testified in intimate detail respecting the actual work done by him in the composition of "The Last Time I Saw Paris",

both asserting and fortifying by the narration of details' transpiring in the course of its composition, the claim that it was wholly original, and finally introducing by photographic copy, the original musical manuscript on which he had written by dictation from their author the words of the lyric and the preliminary musical notes themselves, some time in the summer, and probably in June of 1940. And it is to be observed that the copyright of the composition was effected September 16, 1940.

■■ To the defendant's tender of the foregoing record evidence touching "Lola", the plaintiff seasonably objected. But the court is disposed to overrule the objection and allow the partial copyright record, and, for what it may signify, the fragment of the arrangement to be submitted. However, upon the whole case, the court holds and finds generally for the plaintiff and against the defendant upon the issue of the novelty and originality of "The Last Time I Saw Paris".

That there is a striking melodic similarity between the dominant musical theme of the Macomber arrangement of the chorus of "Lola" (which is only about half as long as that of "The Last Time I Saw Paris") and certain portions of the chorus of "The Last Time I Saw Paris" is unquestionable. Yet, even these similar portions of the two compositions are not identical, as the musical expert witness for the defendant acknowledged, while stating that "I think the average listener on the first hearing would think the tunes were nearly identical." Even there, they are distinguishably notated; and "The Last Time I Saw Paris" both contains certain striking melodic differentiations from "Lola", notably a mildly shocking dissonance in simulation of Parisian taxicabs' "squeaky horns", by way of "suiting the action to the word", which in its creation preceded the music, and also is much longer and varied in its chorus, to say nothing' of its introductory verse, with which no evidentiary comparison was made on the trial.

■ But more persuasively, there is before the court, first, no evidence at all as to the musical or verbal content of C. Arthur Fifer's initial filing of an unpublished composition in the copyright office on April 22, 1940, which alone, of the steps in the creation of "Lola", could possibly have antedated both the composition and final copyrighting of "The Last Time I Saw

Paris"; and secondly, a complete want of evidence either of access, or of the possibility of access, by Mr. Kern to information touching "Lola". Access either in fact or in probability is simply not shown. And the improbability of such access is inferable from standing instructions of the Register of Copyrights forbidding it in cases of unpublished filings, called on the trial to the court's attention. And to negative the plaintiff's claim of originality such access is necessary as the opportunity or occasion for copying. Christie v. Harris, D.C.N.Y., 47 F.Supp. 39; Carew v. R. K. O. Radio Pictures, Inc., D.C.Cal., 43 F. Supp. 199; Arnstein v. Twentieth Century Fox Film Corporation, D.C.N.Y., 52 F. Supp. 114; Arnstein v. Edward B. Marks Music Corporation, 2 Cir., 82 F.2d 275; Arnstein v. Broadcast Music, Inc., 2 Cir., 137 F.2d 410; Darrell v. Joe Morris Music Co., 2 Cir., 113 F.2d 80. There is not present in this instance such measure of identity, coupled with evidence of the priority in point of time of Fifer's production and its original musical content, as would either warrant an inference against Kern of plagiaristic copying, or itself compel the acknowledgment of access.

The court accordingly finds the existence of novelty and originality in the music of "The Last Time I Saw Paris"; and on that issue in case No. 331 rules against the defendant. And, since, only in that instance, was any evidence presented upon the point by a defendant, like ruling is made in each of the other cases.

■ In each case, too, the defendant denies the element of its, or his, or her, public performance for profit of the composition or compositions involved. But it can not be said that there is any real conflict in the evidence upon this point in any of the cases. As a part of footnote 1 appended hereto and already identified, the court sets out in respect of each case and each cause of action in each multiple count case the time and manner in which such performance occurred and the type of business, incident to which the performance was had. In each of seven of the cases the place was a dining or refreshment room in a prominent hotel; in one a separately operated night club; in one, a public roller skating rink; and in each of the remaining two, a large public dance hall. Every one of the places was operated solely for private profit; and music is a factor that is either the indispensable element or the popularizing attraction of all of them. In each instance the proprietor employed a single musician, or an orchestra as the case may be, to perform; and the responsibility for the selection of the musical repertory to be presented rested with the musician—if only one—or the leader of the orchestra. Under the settled law, such a situation establishes public performance for profit. Neither formal intent by the proprietor to infringe, nor his knowledge of the program actually rendered, is required. Herbert v. Shanley Co., 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511; Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266; Harms v. Cohen, D.C.Pa., 279 F. 276; M. Witmark & Sons v. Pastime Amusement Co., D.C.S.C., 298 F. 470, affirmed in memorandum opinion, Pastime Amusement Co. v. M. Witmark & Sons, 4 Cir., 2 F.2d 1020; Berlin Inc. v. Daigle, 5 Cir., 31 F.2d 832; Dreamland Ball Room v. Shapiro, Bernstein & Co., 7 Cir., 36 F.2d 354; Buck v. Russo, D.C.Mass., 25 F.Supp. 317; Buck v. Dacier, D.C., 26 F.Supp. 37; Buck v. Savoia Restaurant, Inc., D.C.N.Y., 27 F. Supp. 289; Buck v. Cecere, D.C.N.Y., 45 F.Supp. 441; Associated Music Publishers v. Debs Memorial Radio Fund, D.C.N.Y., 46 F.Supp. 829; Shapiro-Bernstein & Co. v. Veltin, D.C.La., 47 F.Supp. 648.

■ Some criticism is tendered by the defendants of the witnesses by whose testimony the actual performance of the compositions involved was proved on the trial. They were all hired "music detectives" or "spotters", who went to the places operated by the several defendants for the purpose of observing the musical programs rendered there and, frankly, with a view to the assembling of evidence as the foundation for prospective suits of this character, and to the giving of testimony in such suits if they should materialize. But that circumstance goes only to the question of their credibility. And no issue is made or attempted in the evidence upon the question of the actual performance in any case. At most, the proprietors or managers consistently deny any knowledge of the musical content of their programs, and the musicians with obvious honesty disclaim any distinct recollection whether the numbers identified were, in fact, played at the times noted, though conceding generally that they were being played within that general time range.

534

Want of license or consent to performance is consistently shown. In fact no license is claimed, and the whole position of the defendants repels its possibility. Their view is that it was and still is quite unnecessary.

■ In each count, therefore, the evidence, with the admitted allegations, establishes, (a) authorship of the lyric and music of the composition; (b) originality of the production; (c) the taking of the steps required by law as to copyright registration; (d) the title of the plaintiff to the composition, its copyright and the right of its public performance for profit; and (e) the defendant's public performance without license or consent from the plaintiff of the composition for profit. These are the elements of the offense of violating the plaintiff's monopolistic right accorded by the copyright law, Title 17 U.S.C.A. § 1(e), "to perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit." A more detailed discussion of the aspects or phases of that right will be offered in the course of the consideration herein of the relation to these cases of the Nebraska statute on which the defendants rely.

The facts thus broadly outlined constitute in each of the pending cases the foundation for a judgment as prayed in the several complaints under the authorities already cited, still prescinding from the consideration of the application of the ostensibly pertinent Nebraska statute. However, it is in order now to note, and briefly to consider, certain reasons urged by the defendants, why, even without recourse to Nebraska's legislation, they should be absolved from liability.

Counsel for the defendants argue earnestly in effect that the court should not follow the numerous and generally consistent rulings of the federal courts recognizing liability for infringement in cases comparable to these actions for the asserted reason that they have been pyramided one upon another and all rest upon an initial mistaken notion studiously kept afoot respecting the meaning, and even the actual language or punctuation of the provisions of the copyright law declaring and protecting a copyright proprietor's right of public performance for profit, and especially of Title 17 U.S.C.A. § 1(e). See Hubbell v. Royal Pastime Amusement Co., D. C., 242 F. 1002 in comparison with Title 17 U.S.C.A. §

1(e). One gathers from the briefs maintaining that position that the alleged miscarriage of judicial thinking is to be attributed to various factors, but principally to the astute, and not always too scrupulous, presentation of the position of the copyright proprietors, especially in the earlier and developmental stages of the decisions; to incompetent representation, and in certain notable instances to appearances pro se in behalf of adversely interested litigants; and, while intimated with gracious and becoming delicacy, to an occasional, though uncomplimentarily frequent, Homeric nod on the part of the federal judiciary upon both a horizontal and a vertical pattern. Industry and ingenuity have developed the argument, but they have not fortified it with conviction. And this court is not persuaded that it should presumptuously attempt to reverse the settled, and, it would seem, understanding and correct construction of the statute involved. The argument of counsel for the defendants upon this point and the authorities cited in its support have been carefully and repeatedly examined by the court in the present study; but the court is unable to assent to its validity.

■ It is also argued that, even without resort to Nebraska's statute, a copyright proprietor "has no rights to public performance for profit on songs once sold"; and the phrase "sold songs" recurs frequently in the defendants' briefs. The contention seems to be that, by publishing and selling to the public musical manuscripts in the way of sheet music or more detailed orchestrations of copyrighted musical compositions, the copyright proprietor confers upon the purchasing public the right publicly to perform the compositions sold without liability for infringement. That this contention is not well founded will be apparent from all of the foregoing citations, for they arose out of situations comparable to those here involved. But the elemental vice in defendants' position now under examination lies in this, that it neglects the fact that under the copyright law of the United States, Title 17 U.S.C.A. § 1(a) and (e), the copyright proprietor of a musical composition has two distinct and separable rights, (1) to print and vend published copies of the words and music; and (2) to perform the copyrighted work publicly for profit. Ball on Law of Copyright and Literary Property (1944) p. 421; Buck v. Jewell-LaSalle Realty Co., 283 U.

S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L. R. 1266, Jewell-LaSalle Realty Co v. Buck, 283 U.S. 202, 204, 51 S.Ct. 407, 408, 75 L. Ed. 978, in the latter of which the Supreme Court, speaking through Mr. Justice Brandeis, said: "The Copyright Act confers two monopolies—that of making copies and that of giving public performances for profit."

It neglects another very obvious truth The published sheet music or orchestral arrangement of a musical composition which alone, is "sold" in the vending of a published musical composition, is not the "song". It is merely a graphic portrayal of the impalpable spiritual creation, whether of a single mind or of collaborating intellects, out of which, basically, issue in severalty both the physical published sheets and the exhibition or performance of the composition by voice or instrument or both. So, when the printed sheet music is "sold", the "song" is not "sold." It remains the property of its proprietor and to it is attached the other monopolistic right under the law of public performance for profit. Nor should it be granted, as the defendants assert, that the sale of sheet music or orchestrations necessarily supposes or involves their use as instruments in public performance for profit. The material so sold may be used, among other ways, for the sole enjoyment of the purchaser, for the private pleasure of himself and his family or companions, or for public performance not for profit. Public performance for profit of the represented composition is only one of the many uses to which the published material may be put; and since it constitutes a distinct monopoly of the copyright proprietor (supra), the necessary conclusion is that, without the license of the copyright proprietor, public production for profit will not be considered to be among the uses to which a purchaser may licitly put a published copy of a musical composition which he may acquire in the channels of trade.

██ Then, the defendants contend that the compositions here involved, within the meaning of Title 17 U.S.C.A. § 1(e), being copyrighted and published as individual entities, and in the case of units out of musical shows, separately from the copyright of the entire shows out of which they arose, are not "musical compositions and for the purpose of public performance for profit" and may be performed publicly and even for profit with impunity. Incidentally, it may be observed here that several of the compositions involved were created originally as integral parts of musical shows, and some were isolated and separate compositions. But regardless of their origin, upon that point the position of the defendants is untenable. The defendants elaborate their argument upon this point to a length that precludes adequate discussion here. But it may be noted that they claim convincing support for it from the opinions in Church Co. v. Hilliard Hotel Co., 2 Cir., 221 F. 229, and Herbert v. Shanley Co., 2 Cir., 229 F. 340, affirming, D. C., 222 F. 344, in each of which language occurs justifying the defendants' position. Of course, both of those cases were directly reversed in Herbert v. Shanley Co., 242 U. S. 591, 37 S.Ct. 232, 233, 61 L.Ed. 511. That reversal is acknowledged by the defendants, who, however, profess to derive substantial comfort from the following language of Mr Justice Holmes, in the reversing opinion: "The plaintiffs were the composers and owners of a comic opera entitled 'Sweathearts', containing a song of the same title as a leading feature in the performance. There is a copyright for the opera and also one for the song, which is published and sold separately. This the Shanley Company caused to be sung by professional singers, upon a stage in its restaurant on Broadway, accompanied by an orchestra. The district court, after holding that by the separate publication the plaintiffs' rights were limited to those conferred by the separate copyright,—a matter that it will not be necessary to discuss, —followed the decision in [Church Co. v. Hilliard Hotel Co., 2 Cir.], 221 F. 229, as to public performance for profit." But it must be too obvious for serious difference of opinion that, whether the plaintiffs' right of public performance for profit recognized and enforced under the Supreme Court's opinion reversing the circuit court's rulings in both the Herbert and the Church Co. cases rested upon their copyright of the inclusive operas or their separate copyright of the song in one case, the march in the other, the persistence, notwithstanding the separate copyright of the song and the march, of the rights therein of public performance for profit was at the very core of the Supreme Court's ruling. If, as the circuit court had so clearly asserted in Church Co. v. Hilliard Hotel Co. [221 F. 230], (supra), "When the copyright proprietor of a musical composition sells printed copies of it to the public, the

536

performing right goes with them", and, as the defendants now maintain, that right includes public performance for profit, then there would have remained no right in the plaintiffs Herbert and others upon which the Supreme Court's deliverance could have been premised. It rests upon the implicit hypothesis that, notwithstanding the copyright and publication and sale of printed copies of a musical composition, out of the context of a copyrighted operatic play in which it may originally have been produced, the copyright proprietor has a right of public performance for profit in the separate composition which the Copyright Law erects and the court must protect.

A practice generally pursued in the music publishing business in the United States, but lately rather sharply curtailed, of printing in rough and inexpensive fashion and in varying numbers and distributing free to orchestra leaders what are known as "professional copies" of sheet music was the subject of some testimony. It appears that the practice is designed to secure the popularization of the productions thus treated. That such a custom is commonly pursued by publishers satisfactorily appears. But it is not shown that at any time material in these cases any such copies, particularly of any of the several compositions here involved have been sent either into Nebraska generally or to the performers who have been the subject of testimony in these cases.

Nor, even if the defendants had shown presentation of professional copies of the compositions sued upon to the performers who have given the public performances in these cases, would the court, on that ground, deny recovery. The presentation of such a copy in any instance could not possibly confer on its recipient a license to violate the donor's right of public performance for profit. At most the gift could imply nothing more than the grant of the right lawfully to use the thing given; and, without license publicly to perform the composition for profit, such performance and the use therein of the donated copy would be unlawful.

It is argued that the plaintiffs should be denied relief upon the theory that they come into court with unclean hands. To the extent that this contention rests upon their association with The American Society of Authors, Composers and Publishers (commonly, and hereinafter, identified as ASCAP) it will be given attention under that part of this ruling devoted to the Nebraska statute. Otherwise, the "unclean hands" doctrine seems to be founded principally upon the relatively contemporaneous prosecution by the plaintiffs of all of these cases, and a few others with the resultant probably valid inference of concert among them in the present suits, and upon certain assertedly contemptuous conduct of counsel for the plaintiffs (not including any of those attorneys identified at the heading of this opinion) in the course of the taking of depositions preliminary to trial. As to the former point, if the rights asserted in the cases exist, this court has no concern whether they are vindicated in concurrent or in successive proceedings. The method employed seems reasonable. For the latter charge, the court recognizes that there is no little support in the record. The court forbears to express or discuss the uncomplimentary opinion which it entertains touching the deportment, during the taking of depositions, of certain attorneys representing the plaintiffs, who presumptuously and arbitrarily directed witnesses to refuse to answer questions. But those incidents occurred well before the trial of the cases; and, though they would have warranted disciplinary action against the offending individuals or summary ruling touching the further prosecution of the cases by the plaintiffs involved, the defendants did not elect seasonably to seek such remedies or either of them. So, without approving or condoning the misconduct of the offending attorneys, the court will not, at this late date, allow an incident, or even several incidents, of that character to intercept a ruling in these cases upon their merits.

Upon the consideration of the cases, divorced from the effect upon them of the Nebraska statutes, the court is satisfied that on each count the plaintiff therein has made out an appropriate case for the recovery by it of relief.

The second of the principal phases of the cases arises out of Chapter 59, Article 12 of the Compiled Statutes of Nebraska, 1941 Supp. Although its discussion will require a relatively small portion of this opinion, it is undoubtedly the prime occasion for the suits. The statute in question is Chapter 138 of the Laws of 1937 of Nebraska, and includes thirteen sections. The first and second sections of the act, being respectively Sections 59-1201 and 59-1202, C.S.Neb.1941 Supp., are set out fully

in a footnote[3] and will not be unnecessarily repeated or referred to hereafter. The remaining sections of the statute deal either with specific users of copyrighted material or with the administration of the act.

Manifestly the act has two main phases, the first (Section 59-1201) making illegal the combination in a society or group of the proprietors of copyrighted musical compositions for their mutual advantage in the matter of prescribing and collecting license fees or exactions for the public performance for profit of their compositions within Nebraska; and the second (Section 59-1202) seeking to control and prescribe by state statute the manner by which alone such proprietors, even acting individually, may license or permit, and profit from, the public performance for profit of their works in Nebraska. That these phases are truly distinct both seems obvious from

[3] COPIES OF FIRST TWO SECTIONS OF NEBRASKA STATUTE:

"59-1201. Monopolistic Practices Relating to Musical Compositions Declared Unlawful. It shall be unlawful for authors, composers, proprietors, publishers, owners, or their heirs, successors or assigns, of copyrighted vocal or instrumental musical compositions to form any society, association, club, firm, partnership, corporation, or other group or entity, called herein a combination, either within this state or outside thereof, when the members, stockholders, or interested parties therein constitute a substantial number of the persons, firms or corporations within the United States who own or control copyrighted vocal or instrumental musical compositions, and when at least one of the objects of any such combination is the determination and the fixation of license fees or other exactions required by such combination for itself or its members, stockholders or other interested parties for any use or rendition of copyrighted vocal or instrumental musical compositions for private or public performance for profit within this state for the purpose of preventing free competition among or with different and competing copyright owners or among or with persons, firms, corporations or associations in this state using or rendering such copyrighted matter by public performance for profit; or for the purpose of dividing among them the proceeds of the earnings of such copyright owners; or for the purpose of fixing the exactions and fees for the rendition or use of copyrighted matter which any copyright owner must charge; and the collection or attempted collection within this state of such license fee or other exactions so fixed and determined, by any member, agent or representative of any such combination herein declared unlawful, from any person, firm, corporation or association within this state, including theatres, radio receiving, radio broadcasting and radio re-broadcasting stations. moving picture houses, athletic associations, hotels, cafes, restaurants, clubs, dance halls, recreation rooms, amusement parks, pavilions, churches, colleges, schools, universities, or the officers, directors, proprietors, managers, owners or representatives thereof, who render or cause to be rendered, or permit to be rendered, such copyrighted vocal or instrumental musical compositions privately or publicly for profit within this state through personal performance, or through radio, or any instrumentality or sound producing apparatus, shall be and the same is hereby declared unlawful and illegal; and such license fees or other exactions shall not be collected in any court within the boundaries of this state; and each collection or attempted collection of such license fee or other exaction by such combination or its agents, representatives, members, stockholders or interested parties shall be a separate offense hereunder; and any such combination of authors, composers, publishers, or their heirs, successors or assigns, as herein defined, is hereby declared to be an unlawful monopoly in this state; and such fixing of prices for use or rendition of copyrighted musical compositions within this state by such unlawful combination and the collecting or attempting to collect such license fees or other exactions by it or for its stockholders, members or other interested parties within this state is hereby declared illegal and in restraint of trade, and such collection or attempted collection thereof is declared to be an illegal intrastate transaction within this state and shall be subject to the terms and penalties of this Act. In any action, civil or criminal, instituted under the provisions of this Act, it shall be prima facie evidence against any party to such action of the existence of such unlawful combination for the purposes in this Act enumerated, if a substantial number of all authors, composers, proprietors, publishers, owners or their heirs, successors or assigns of copyrighted vocal or instrumental musical compositions in the United States, are shown to be members of any society, association, club, firm, partnership, corporation, group or entity. (1937 p. 489).

"59-1202. Rights of Authors, Composers, Publishers, Defined. (A). All authors and composers, and their heirs and assigns,

the contexts of the two sections, as emphasized by a separability clause in the statute (Section 59-1212), and has been directly and finally determined by the Supreme Court of the United States. Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L. Ed. 1426; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416.

While the opinions just cited have been considered and may reasonably be understood by some readers as sufficiently grounded on the single premise of the declared absence of threat of criminal prosecution or irreparable injury, such a view of them is unreasonably narrow and inadequate. They go farther than that, and, for this court at least, determine finally that the prohibition of combinations among copyright proprietors and others, contained in Section 59-1201, C.S.Neb.1941 Supp., is

---

shall have within this state all the benefits conferred by the Copyright Laws of the United States, being the act of March 4, 1909, c. 320, Section 1(e), 35 Stat. 1073, Title 17, U.S.C.A. Each author, composer and publisher shall act independently of any and all substantial number or numbers of other authors, composers and publishers, and also independently of any such combination as in Section 1 (59-1201) hereof declared unlawful, in determining and fixing the price to be charged for the use or rendition of his copyrighted musical compositions within this state, and the author, composer or publisher, or his, her, or its heirs, successors or assigns, shall specify or cause to be specified legibly upon the musical composition, in whatever form the same may be published, printed, manufactured or otherwise prepared for use or rendition within this state, the selling price thereof for private rendition or public rendition for profit if made available for such public rendition so arrived at and determined for all uses and purposes; and when any publisher or user acquires the same within this state and pays the selling price so specified thereon to the seller or publisher of said copyrighted musical composition, then said purchaser or user may use or render, or cause or permit to be used or rendered within this state, the said copyrighted musical composition by persons individually or with other performers, actors and singers, or by an individual instrument player, or by orchestras and bands, or over or through or by means of radios, loud speakers, radio receiving, radio broadcasting and radio re-broadcasting stations, electrical transcriptions, musical records, sound apparatus or otherwise within this state, and the same may be so rendered either privately or publicly for profit when so purchased and paid for without further license fees or other exactions; and such copyright owner or proprietor, in the event of such payment, shall be deemed to have received full compensation for the rendition and all uses of such musical compositions for private purposes or for public performance for profit by such purchaser within this state.

"(B). In the event any author, composer or publisher, or any of his heirs, successors or assigns, fails or refuses to affix on the musical composition the selling price, and collect the same, for private and public performances for profit, at the time and in the manner specified in this Act, then any person, firm or corporation in this state who may have purchased and paid for such copyrighted musical composition may use the same for private or public performance for profit within this state without further license fee or other exaction; and such person, firm or corporation so using or rendering the same shall be free from any and all liability in any infringement or injunction suit, or in any action to collect damages, instituted by such copyright proprietor or owner in any court within the boundaries of this state.

"(C). Nothing in this section, or this Act, shall be construed to give to any purchaser of copyrighted music compositions, as herein provided, the right to resell, copy, print, publish, or vend the same.

"(D). Any composer, author or publisher of vocal or instrumental copyrighted musical compositions, or any person, firm or corporation controlling the sale or distribution of said compositions, whether or not within the purview of the combination described in Section 1 (59-1201) of this Act, shall before selling or disposing of any of such composition in this state file in the office of the Secretary of State a copy of each said composition upon which shall be written, printed or typed over his or its signature a statement to the effect that he or it controls the sale or disposition of such composition; and provided further, said person, firm or corporation who shall make such filing shall accompany the same with a fee of Twenty-five Cents (25¢) with each copy of said composition so filed to reimburse the Secretary of State for keeping in current and convenient form, easily accessible to the public, the titles of said compositions and the names of the persons, firms or corporations who shall file said copies from time to time; and provided further, said secretary of State shall deposit all the fees received hereunder weekly with the state Treasurer who shall credit said fees to the general fund of the state. (1937 p. 491.)"

within the legislative power of Nebraska and valid. Upon that point, "causa finita est."

But no combination is involved in any of these suits. Each is conducted by the individual copyright proprietor in its own name and behalf—and, so far as there is an issue upon it, the court finds, solely for its own benefit.

ASCAP is the combination at which the first section of the Nebraska act is primarily aimed. Its organization and operations have been narrated so frequently in judicial opinions that it is considered unnecessary now to recall them. It may be taken as found by this court, that at all times material in these cases, each plaintiff herein was a member of ASCAP, as were also the authors and composers of their works and in the case of deceased authors or composers, their personal representatives; that sundry officers of the various plaintiffs, and the individual plaintiff, Mr. Jerome Kern, were active in the management and operation of ASCAP in its dealings outside of Nebraska. But the court also finds that at no time involved in any of these cases, nor at any time more recently than December 17, 1941, has ASCAP either transacted any business in or had or professed to have any interest in any rights of public performance for profit in copyrighted musical compositions within the state of Nebraska; that on that date ASCAP by formal resolution revested in and relinquished "to the respective members of said society, all rights of every name, nature and character which each such respective member has heretofore vested in the society with respect to the licensing of, and the right to license in the state of Nebraska, the right to perform publicly for profit any and all musical compositions composed, copyrighted, published or owned by such respective members"; that said resolution, including the revesting and relinquishment therein professed, was not a subterfuge or simulation, but, though reluctant and compelled by law, was genuine and real and in good faith, and has consistently been honored by ASCAP; that ASCAP actually discontinued business in Nebraska promptly after the decision of the Supreme Court of the United States in Marsh v. Buck (supra) on May 26, 1941.

The situation respecting ASCAP and the plaintiffs is simply this: Beyond the boundaries of Nebraska—and excepting perhaps other states where it may be barred —the society functions and the plaintiffs participate in its efforts, enterprises and benefits. So far as Nebraska is concerned, ASCAP is nonexistent. Indeed, in their own brief, the defendants assert: "ASCAP" pulled out "of the state of Nebraska on May 26, 1941," and that language seems to accord with the facts. It left, hat in hand, because it was not wanted, and was in fact declared unlawful in, and banished from, the state.

But, by the same logic wherewith, in Marsh v. Buck (supra) Nebraska vindicated its lawful right in its sole discretion to regulate or strike down monopoly within its own borders, its legislation must be denied any extraterritorial effect. Nebraska's Legislature is not the arbiter of the internal morality or the domestic policy of any state other than Nebraska, or of the nation as a whole. Therefore, ASCAP, an outlaw in Nebraska, may be, in fact is, a lawful society elsewhere and is even regarded in other states as a practical and meritorious device, by way of accommodation, for the purpose of its erection.

That, in their dealings exclusively beyond Nebraska, the plaintiffs adhere to membership in ASCAP does not subject them to any justifiable imputation of wrongdoing. It does not make them violators of our laws or bar the doors of our courts to them. Section 59-1201, C.S.Neb. 1941 Supp., does not even assume to do that. So, this court considers that the membership of the plaintiffs in ASCAP and the participation of their officers in its activities does not constitute a legal defense in any of these cases.

For the same reason neither does it so pollute them as to subject them to the operation of the doctrine of unclean hands. If they desire to operate through ASCAP beyond Nebraska's borders, that is simply not Nebraska's concern and occasions no stricture from a federal court, though sitting within and for Nebraska.

In passing, the court observes and finds that plainly marked upon most of the sheet music in evidence in the cases is a legend identifying it as connected in some way with ASCAP, as for example by a printed stamp bearing the device of ASCAP. (In the findings of fact counsel will make proper identification of the sheet music thus marked). However, that legend can have no significance beyond the identification of the particular selections involved as units

of the ASCAP portfolio in those areas where ASCAP operates. In Nebraska it is a harmless nullity.

All parties have discussed in this connection, as well as in others, the consent decree rendered March 3, 1941, filed March 4, 1941, in the United States District Court for the Southern District of New York in United States of America, plaintiff, v. American Society of Composers, Authors and Publishers, and others, defendants.[4] It is impossible for this court to consider that the decree has any real significance here, beyond a possible indication that ASCAP is not an illicit society, save in those areas where as in Nebraska it has been explicitly denounced. And it is not needed for that purpose. The court would so find without it.

But it is also claimed that the very corporate organizations and marketing operations of all of the plaintiffs constitute violations of Section 59-1201, C.S.Neb.1941 Supp. This contention arises principally from the fact that all of the capital stock of the several plaintiffs in cases numbered 321, 322, 325, 327, 328 and 329 is owned by Music Publishers Holding Corporation, which also operates as their selling agency for the marketing of their published music, though it has no interest whatsoever in their rights of public performance for profit of their copyrighted musical compositions; that those plaintiffs and Music Publishers Holding Corporation have generally, though not exactly, the same officers; and that they maintain common business offices in New York City; and in the case of the plaintiffs in cases numbered 331, 332 and 334, that the corporate plaintiffs have interlocking management, and the plaintiff in number 331 acts as selling agent for the published music but not the performance rights of the corporate plaintiff in numbers 332 and 334; and in the case of the plaintiff in cases numbered 443 and 509, that, even standing alone, it has a large number of copyrighted musical compositions in its ownership and under its control, a criticism which is also directed against each of the plaintiffs in the other cases.

But it is too obvious to require discussion that such corporate operations are not within the definition and condemnation of the cited section of the statute, and that observation applies with full effect to the relation of Music Publishers Holding Corporation to those of the plaintiffs whose capital stock it owns and for which it acts as selling agent for their published music sheets.

The court proceeds finally to the consideration of the impact upon these cases of Section 59-1202, C.S.Neb.1941 Supp. The pertinent and unquestioned facts upon that question are that no corporate plaintiff is incorporated or has, at any material time, done or transacted any business in Nebraska, or sold in or into Nebraska, either directly or indirectly by domestic sale, or otherwise than through the channels of interstate commerce, any published sheet music or orchestral arrangements; that at all material times music dealers in Nebraska have purchased and received through the channels of interstate commerce from the several plaintiffs, either immediately, or through their selling agent or agents, published sheet music and orchestral arrangements of their respective copyrighted musical compositions, obviously for the purpose of resale by such music dealers in Nebraska, but on their own account to their local trade; that an adequate supply of such sheet music and orchestral arrangements has consistently been available in the local stores of such music dealers; that sheet music or orchestrations of some, though not all, of the numbers in respect of which these cases are conducted were purchased by the orchestra leaders who actually directed the playing of the music (here, counsel in drawing the findings of fact in the several cases may appropriately find in each case the fact upon the point last mentioned, in accordance with the evidence. And in this connection, the court rules that the deposition of Paul Moorhead, Arthur Randall and Deb Lyon taken September 5, 1944, shall be received in evidence and their respective statements as well as those of other orchestra leaders and musicians testifying on the trial, touching their purchase of sheet music and orchestrations are accepted as true. The court does not separately analyze and identify those statements here, because in the view which is taken of the law, they are not controlling); that no plaintiff herein has, at any time material in these cases, granted any consent, license or permit to any one for the public performance of any of its musical compositions within the state of Nebraska, or specifically any of the music here in question; and that no plaintiff has ever

---

[4] No opinion for publication.

taken any step whatsoever in the way of complying with the provisions of Section 59-1202, C.S.Neb.1941 Supp., which the plaintiffs and each of them have at all times claimed to be invalid and unconstitutional.

And now to the constitutional status of Section 59-1202, C.S.Neb.1941 Supp. After the enactment in 1937 of Chapter 59, Article 12, C.S.Neb.1941 Supp., sundry interested persons and corporations, including most, if not all, of the present plaintiffs filed in this court a proceeding whose object was the interception by injunction of the enforcement of the legislation. It came on for hearing before a three-judge court whose members were Circuit Judge Archibald K. Gardner, the present senior District Judge James A. Donohoe, and the late District Judge Thomas C. Munger. Thus constituted, this court, speaking through Judge Gardner, on December 28, 1939, delivered its opinion holding that that portion of the legislation which is now Section 59-1202 was unconstitutional and void as a violation of the "due process" and "equal protection" provisions of the federal Constitution and an attempt to deprive copyright proprietors of certain rights within the state of Nebraska, accorded them by the National Copyright Law; that this portion of the act was the essential inducement for the entire measure and inseparable from its other parts, thus rendering the whole act invalid; and that the injunction sought should be allowed. Buck v. Swanson, D.C.Neb., 33 F.Supp. 377, 387, 388.

Appeal was taken to the Supreme Court of the United States, which, on May 26, 1941, delivered its opinion, written by Mr. Justice Black, reversing this court's judgment; holding, first, that there was not present a definite threat of prosecution and a clear showing of great and irreparable loss; that the provisions of Section 59-1201 dealing with monopolistic combinations were complete in themselves and distinct and separable from those of Section 59-1202 and, so considered, were valid and within the competency of the Legislature of Nebraska and enforcible; and declining to pass generally upon the rest of the Nebraska act. Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L.Ed. 1426. See also Watson v. Buck (concurrently decided as basic opinion) 313 U.S. 387, 61 S.Ct. 962, 85 L. Ed. 1416.

And for the relatively parallel history of legislation in Florida see: Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111; Buck v. Gibbs, D.C.Fla., 34 F.Supp. 510; and Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L.Ed. 1426. It may be observed at this point that this court attaches no weight to the determination in those cases that the provisions of the 1937 act of the Florida Legislature comparable to those of Section 59-1202, C.S.Neb.1941 Supp., were constitutionally invalid. That determination seems to have been reached with the concession of the state authorities and thus to be deprived of much, if not all, of the force which it might otherwise have as authority.

Counsel for the contending parties urge upon the court widely variant views of the effect of the several cited decisions touching the Nebraska statute, neither of which is well taken.

For the defendants it is broadly asserted that by the ruling of the Supreme Court of the United States in Marsh v. Buck (supra) dismissing the injunctive action of the plaintiffs therein, the Nebraska legislation in its entirety was sustained and approved. There is not the slightest warrant for such an argument. The Supreme Court dealt with, and sustained as separable from the other criticised portions of the act, only what is now Section 59-1201. And, if there be any doubt upon that understanding, it is eliminated by the following language from Watson v. Buck [313 U.S. 387, 61 S.Ct. 967] (supra) which is the basic opinion on the question: "But at this time the record does not justify our passing upon any part of the statute except, possibly, that phase which prohibits activities in Florida by combinations declared unlawful." Thus, some persons may reasonably doubt the finality even of the Supreme Court's approval of Section 59-1201. But this court has no such doubt and does not mean to intimate the possibility of its entertainment of such a view.

Nor are the plaintiffs more reasonable in their position. They, or at least some of them, contend that, because of the constitution of the three-judge court which delivered the opinion in Buck v. Swanson (supra), this court is now inflexibly bound by its determination of the unconstitutionality of Section 59-1202, and may not properly re-examine, or independently determine upon, that question. That

position is untenable. However constituted, the court which spoke in Buck v. Swanson (supra) was only the District Court for the Federal Judicial District of Nebraska.

And, apart from the great respect which the writer entertains for the legal scholarship of its members, its deliverance in Buck v. Swanson (supra) is entitled to no more control over the later decisions of judges of this court than any other opinions of the District Court for the District of Nebraska. Indeed, since the ultimate decision of the Supreme Court in that case rested solely upon the validity of Section 59-1201, which was declared to be distinct and separable from Section 59-1202, what the trial court's opinion in Buck v. Swanson (supra) declared respecting Section 59-1202 may even be regarded as obiter dictum.

In any event, this court considers that, as authority in the present instance, Buck v. Swanson (supra) should be measured by the maxim: "tantum valet auctoritas quantum valet ratio", that it should be followed, if at all, not because it is compellingly authoritative, but because it is objectively right. But, even thus evaluated, it is regarded as correct so far only as it deals with the material in the Nebraska statute which is presently Section 59-1202. And since that court's view of the invalidity of that portion of the statute was so clearly expressed, it is now repeated and adopted. It was there said (33 F.Supp. 377 at pages 387–388):

"It is contended that the state statute deprives copyright owners of the right to control public performance for profit of their copyrighted musical compositions apart from the sale of sheet music. The copyright is distinct from the material object copyrighted. It is an intangible incorporeal right in the nature of a privilege or franchise quite independent of any material substance such as the manuscript or the plate used for printing. King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533. The owner of the copyright has the right to dispose of it on such terms as he may see fit, or he may decline to dispose of it on any terms. He has an individual right of exclusive enjoy-

ment similar to that of a patentee of an invention. * * *

"The right of an author in his intellectual production is similar to any other personal property right. It is assignable and it may be sold and transferred in its entirety, or a limited interest therein, less than the whole property, may be sold and assigned, and the various rights included in the entire ownership may be split up and assigned to different persons. Sales may be absolute or conditional and they may be with or without qualifications, limitations or restrictions. Atlantic Monthly Co. v. Post Pub. Co., D.C.Mass., 27 F.2d 556; American Tobacco Co. v. Werckmeister, supra [207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595].

"Section 2(A) of the state statute requires the author, composer or publisher to specify legibly upon the musical composition, in whatever form it may be published, 'the selling price thereof for private rendition or public rendition for profit if made available for such public rendition so arrived at and determined for all uses and purposes.'

"The right of public performance in connection with the composition includes separate and distinct rights, among them being: (1) the right of publication; (2) the motion picture rights; (3) the stage rights; (4) the recording rights; and (5) the radio reproduction rights. The copyright owner might wish to grant one of these rights to one party and another right to a different party. As the exclusive owner, he is entitled to that right. The above statute, however, interferes with his so doing." [5]

"Section 2(B) of the statute provides that: 'In the event any author, composer or publisher, or any of his heirs, successors or assigns, fails or refuses to affix on the musical composition the selling price, and collect the same, for private and public performances for profit, at the time and in the manner specified in this Act, then any person, firm or corporation in this state who may have purchased and paid for such copyrighted musical composition may use the same for private or public performance for profit within this state without further license fee or other

---

[5] In approving Judge Gardner's reasoning, this court considers that what he denominates "the stage rights" should properly be further analyzed to show that they comprehend both the larger dramatic performance rights and the so-called "smaller rights" which are customarily divorced from dramatic production, and are illustrated by the performances in these cases.

exaction; and such person, firm or corporation so using or rendering the same shall be free from any and all liability in any infringement or injunction suit, or in any action to collect damages, instituted by such copyright proprietor or owner in any court within the boundaries of this state.'

"Under this subsection, the copyright owner in effect must offer the public performance rights of his copyrighted composition for sale and use in Nebraska, and if he does not choose so to do any person purchasing the composition may use it in the state for public performance without any liability to the copyright owner. This provision, we think, clearly deprives the owner of the copyright of rights to which he is entitled under the Copyright Act. As observed, his rights of ownership entitled him to sell or offer to sell, or to withhold from sale, as he may choose.

"The state statute can not be justified as a method of exercising the police power. The police power may not be extended to the extent of taking private property for a public use. Panhandle Eastern Pipe Line Co. v. State Highway Commission, 294 U. S. 613, 55 S.Ct. 563, 79 L.Ed. 1090.

"While the power reasonably to restrain unlawful monopolistic trade-restraining combinations from exercising any rights in the state may be conceded, an act which compels the owner of a copyright to offer it for sale in a certain way, and if he fails so to do to take it from him without compensation, violates the due process and equal protection clauses of the Constitution [Amendment 14], and it is also violative of the Federal Copyright Act."

That language expresses with complete clarity the present view of this court and will be amplified only very briefly.

If doubt be entertained regarding Judge Gardner's inference, from Section 59-1202(B), C.S.Neb.1941 Supp., that the Nebraska act compels a copyright owner to offer the right to public performance for profit of his copyrighted musical composition for sale and use in Nebraska, with the alternative of a legislative bestowal, upon anyone purchasing a published copy of the composition, of the right publicly to perform it for profit in Nebraska without liability to the copyright owner, at least two answers to the question thus offered seem to be valid. In the first place, while

Section 59-1202(A) by its limiting words "if made available for such public rendition" may possibly be considered as theoretically allowing a copyright proprietor the privilege, of dubious material value, completely to deny the right of public performance for profit of its composition and perhaps to give notice of such unlimited denial on the published copies of its sheet music, in practice that is neither the purpose nor the operative consequence of the statute. Considered realistically, and in the light of the actual use of musical compositions, subsection (B) is, as Judge Gardner implicitly asserted, the vital and effective part of the section. In the second place, even if it be granted that the statute allows a copyright proprietor the right wholly to withdraw its composition from public performance for profit, that is only one, and in practice the least valuable, of the several aspects of the right of public performance for profit; and its other phases are certainly destroyed in Nebraska if Section 59-1202, C.S.Neb.1941 Supp. be valid. In considering this point in the present case it is hardly possible to forget or disregard the repeatedly asserted contention of the defendants that, even beyond Nebraska, the right publicly to perform a copyrighted musical composition for profit accrues to the purchaser of sheet music of the composition by force of that purchase alone. Section 59-1202 is —and was intended in practical operation to be—an act of nullification of valuable rights under the national Copyright Act, 17 U.S.C.A. § 1 et seq., whose justice and validity its proponents denied and still deny. (Vide supra.)

The right of public performance for profit assured to the copyright proprietor of a copyrighted musical composition by Title 17 U.S.C.A. § 1(e), had been defined and determined by the federal courts, including the Supreme Court of the United States long prior to the enactment of the Nebraska law in 1937. That valuable property had been held, under authorities already cited herein, to include, among others, (1) the right to perform the composition by himself and with no license to others, if he be so advised; (2) the right to license performance by one and deny the privilege to all others; (3) the right to fix the price and terms upon which license would be granted; (4) the right to limit public performance for profit to certain places; and (5) the right utterly

to forbid public performance for profit. Those were rights conferred upon a nationwide pattern, by the national Copyright Act in the exercise of a power expressly granted to the Congress by the Constitution, Article 1, Section 8, Clause 8.

Reduced to its simplest consequence, Section 59-1202, C.S.Neb.1941 Supp., declares that the right thus competently granted by the Congress and defined by the courts shall no longer exist in Nebraska. The opening sentence of the section (vide footnote 3) to the contrary is meaningless if not positively false in the light of the specific language which follows it in the section and empties it of any practical significance.

A basic conceptual vice of Section 59-1202 is that it is bottomed on, and seeks legislatively to accomplish, the defendants' fallacious theory that the right of public performance for profit of a copyrighted musical composition is connected with and flows from the published sheets or manuscripts of the sheet music or orchestral arrangements of the composition. The legal truth is (vide supra) that the right of public performance for profit and the right to publish and vend are separate and distinct rights in the copyrighted entity both—but separately—deriving from the copyright and guaranteed by the Copyright Law. Under the Copyright Law the proprietor may exercise one of those rights and forbear to exercise the other, or exercise the other within such limits as to him may seem appropriate. It is in plain negation and frustration of that power that Section 59-1202 assumes to act.

Whatever may be professed as its purpose, in support of Section 59-1202, it is actually designed practically to strike down and nullify within the state of Nebraska the right of public performance for profit. Giving no thought to the rather notorious history of its enactment, that is its obvious consequence and its manifest object.

For decisions dealing with legislation of other states comparable in its ultimate objective, though not identical either in method or in scope, see Leo Feist, Inc., v. Young, 7 Cir. 138 F.2d 972, reversing, D. C., 46 F.Supp. 622, and Leo Feist, Inc., v. Demarie, D.C.La., 16 F.Supp. 827, in each of which conclusions similar in general thought to that arrived at here are reached. If it be granted, as the defendants argue, that those cases are not directly in point in the present controversy, their reasoning is, nevertheless, instructive upon the point now involved, and cogent.

And that prompts the court merely to mention the concluding sentence of Section 59-1202(B), C.S.Neb.1941 Supp. It endeavors to free any one purchasing sheet music or orchestral arrangements of copyrighted music in Nebraska and using or rendering the music reflected therein in Nebraska "from any and all liability in any infringement or injunction suit, or in any action to collect damages, instituted by such copyright proprietor or owner in any court within the boundaries of this state." And since, under the Copyright Act, the federal courts alone possess jurisdiction in such suits, Title 17 U.S.C.A. § 34, see also Title 28 U.S.C.A. § 41(1) and (7), the state statute is directed at this court only. So, we have in the Nebraska act the direct attempt to defeat recovery in the federal courts which the courts declined to construe as present in the Wisconsin and Louisiana statutes.

It can not appropriately be urged that this court should becomingly refrain from declaring the state statute invalid and allow the state courts, in the course of time, to construe and perhaps to limit the scope of the section of the statute involved. The issue is here presented by the defendants themselves as a bar to the plaintiffs' recovery; and, as such, it must be decided. Besides, the very nature of the section of the statute involved precludes the likelihood of its presentation to the state's courts. Here is where issues in respect of its coverage and validity are naturally and ordinarily to be expected.

Noted without decision is a contention on the part of certain of the plaintiffs that the entire legislative measure which is Chapter 59, Article 12, is unconstitutional because, though amendatory of Sections 59-801 to 59-822, inclusive, C.S.Neb.1929, it does not contain, refer to, or repeal those sections, within the provisions of Section 14 Article III of the Constitution of Nebraska. Regard being had to the foregoing discussion of the Nebraska statute here pertinent it seems unnecessary to pass upon this position of certain plaintiffs. But it is remarked—though without deciding the point—that there is much force to the argument contra by the defendants to the effect that Chapter 59, Article 12, is an independent act, complete within itself, and not properly to be regarded as an amendatory act. And here is an issue, upon which,

if it be possible and practicable to obtain it, the determination should come from Nebraska's courts, since it concerns the procedural observance by the state's legislature of its own Constitution.

 The final specification by the defendants under their charge of unclean hands is that the plaintiffs have presumed to ignore and to refuse to comply with Section 59-1202, C.S.Neb.1941 Supp. There is no virtue in the assignment. If Section 59-1202 be valid, then it is a complete legal defense in these cases which has no need of the doctrine of unclean hands for its support. If it be void, then the failure to submit to it is the simple right of each plaintiff, for which it is in no wise censurable.

The court, therefore, concludes that the rights which the plaintiffs would otherwise possess can not be defeated by the provisions of Section 59-1202, C.S.Neb.1941 Supp., and by their failure to observe and comply with its requirements. Judgment is accordingly granted to the plaintiff in each case and upon each separate count in multiple count cases.

 As to its scope, the judgment allows in each single count case and upon each cause of action in each multiple count case, (a) an injunction restraining further infringement in respect of the specific composition involved, Title 17 U.S.C.A. § 25(a); and (b) actual damage in any specific sum not having been established, a personal judgment for the plaintiff and against the defendant in the sum of $250.00. Title 17 U.S.C.A. § 25(b); Jewell-LaSalle Realty Co. v. Buck, 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978; Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499; Buck v. Bilkie, 9 Cir., 63 F.2d 447; M. Witmark & Sons v. Pastime Amusement Co., D.C.S.C., 298 F. 470; Buck v. Lisa, D.C.N.Y., 28 F.Supp. 379; Buck v. Dacier, D.C.Mass., 26 F.Supp. 37; Buck v. Milam, D.C.Idaho, 32 F.2d 622. In no case is a single defendant charged with more than one infringement of any one composition. Costs are adjudged against the defendant in each case. Title 17 U.S.C.A. § 40. Upon the question of the allowance of an attorneys fee the discretion of the court must control. Title 17 U.S.C.A. § 40. Regard being had to the nature of these cases, their presentation together, the work of counsel involved and many other factors, the court allows a fee of .$150 in each single count case and $300 in each multiple count case, irrespective of the number of counts in the latter group of cases. It may frankly be acknowledged that the fees allowed are quite inadequate fully to pay for the services rendered. On the other hand, the court considers that this measure of indulgence may be allowed the defendants; for, though they have resisted the demands of the plaintiffs upon every possible ground and have constantly asserted their right to use for their own profit the plaintiffs' music without compensation, some consideration may be allowed them upon the score of the ostensible grant of that right to them under the Nebraska law.

Counsel for the plaintiff in each case will promptly prepare and submit to counsel for the defendant for approval comprehensive findings of fact, conclusions of law and judgment. In this connection, while the factual findings will generally follow the facts noted in this memorandum, they will not be limited to its recitals. Obviously, many details have necessarily been omitted from this opinion for the sake of brevity, although it is considered that all essential ultimate facts have been noted.

If agreement is achieved between counsel the findings, conclusions and judgment in each case shall be submitted informally to the court for settlement. In default of agreement, they may be presented upon five days' notice for settlement to the judge at Lincoln, or with the judge's approval as to date, at Omaha.